IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| HOWARD RIMSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:21-00553-CV-RK |
| | ) | |
| AMAZON LOGISTICS, INC., VENUS, LLC, AMAZON.COM SERVICES, LLC, | ) ) ) | |
| Defendants. | ) | |

## ORDER

Before the Court is Defendant Venus, LLC's ("Venus") motion for summary judgment as to all of Plaintiff Howard Rimson's claims. (Doc. 137.) The motion is fully briefed. (Docs. 138, 149, 150, 151, 152, 153, 154, 160.) For the reasons below, (1) the motion is **GRANTED** as to Plaintiff's MHRA racial harassment and aiding and abetting racial harassment claims as contained in Count 1, and Plaintiff's § 1985 civil conspiracy claim as contained in Count 3; and (2) the motion is **DENIED** in all other respects.

## Background

Plaintiff filed his Third Amended Complaint on March 16, 2022, alleging, among other things, that Defendant Venus was one of the delivery service partners of Defendant Amazon, Inc., and Defendant Amazon Logistics, Inc. (collectively "Defendant Amazon"), and that Plaintiff unsuccessfully sought employment with Defendant Venus in March 2020. (Doc. 83 at ¶ 7.) Plaintiff, an African American, alleges he was prevented from gaining employment because of joint arrangements between Defendant Amazon and Defendant Venus with respect to (1) discriminatory hiring and training practices for Amazon drivers, (2) the discrimination in the on-boarding of drivers, and (3) discrimination in establishing the eligibility or ineligibility status of applicants that all delivery service partners must agree to use (and/or in practice do use) in employment hiring decisions for Amazon drivers. (*Id.* at ¶¶ 7-9.)

In its motion for summary judgment, Defendant Venus' statement of uncontroverted material facts explains that Amazon hires third-party companies, known as Delivery Service

Partners ("DSP"), to deliver Amazon packages.[1] (Doc. 138-1 at ¶ 1.) Amazon has delivery stations, called DMCs, where the packages go for the last mile before they arrive to the customer. (*Id.* at ¶ 2.) Amazon has a delivery station called DMC2 in a facility located at 3601 Enterprise Drive, Kansas City, Missouri, at which Defendant Venus and Precise Packaging ("Precise") (a former codefendant in this case) are DSPs. (*Id.* at ¶¶ 3-4.)

Plaintiff worked for Defendant Amazon as a seasonal driver from July 2019 to January 2020. (*Id.* at ¶ 6.) As a seasonal driver, Plaintiff delivered packages to customers based on assigned routes. (*Id.* at ¶ 7.) During his seasonal employment with Defendant Amazon, Plaintiff reported incidents to Defendant Amazon's supervisors about customers who used racial slurs and displayed guns. (*Id.* at ¶ 8.) Following Plaintiff's seasonal employment, Plaintiff sought employment as a Delivery Associate. (*Id.* at ¶ 22.)

Defendant Venus conducts job fairs and advertises for drivers in a variety of forums, including Indeed.com, a job-posting/search website. (*Id.* at ¶ 9.) Once a viable candidate comes to Defendant Venus, it interviews the candidate. (*Id.* at ¶ 10.) If Defendant Venus determines the candidate is suitable to be a Delivery Associate, it uploads the candidate's driver's license, name, date of birth, and address into the Amazon portal. (*Id.* at ¶ 11.) Candidates are required to consent to a background check, which is conducted by a third party. (*Id.* at ¶ 12.) Candidates are also required to consent to a drug test, which is arranged by Defendant Venus, and the results are provided to Defendant Amazon. (*Id.* at ¶ 13.) When the background check results are provided to Defendant Amazon, Defendant Amazon then informs Defendant Venus whether or not the driver is cleared to proceed with the hiring process. (*Id.* at ¶ 14.) If a candidate is cleared by Defendant Amazon to proceed with the hiring process, Defendant Venus rosters the candidate for in-person training. (*Id.* at ¶ 15.)

Completion of the in-person training is a requirement to work for Defendant Amazon or the Delivery Service Partners as a Delivery Associate because without it, Delivery Associates cannot perform their positions. (*Id.* at ¶ 16-17.) The in-person training is taught by Amazon employees at an Amazon Delivery Station. (*Id.* at ¶ 18.) After a candidate completes training, Defendant Amazon issues the candidate a badge, then Defendant Venus puts the Delivery

---

[1] Unless otherwise noted, these facts are taken from the parties' statements of uncontroverted material facts. The Court has omitted some properly controverted facts, assertions that are immaterial to the resolution of the pending motion, assertions that are not properly supported by admissible evidence, legal conclusions, and argument presented as an assertion of fact.

Associate on the road with another Delivery Associate until he or she satisfactorily completes on-the-job training for picking up and delivering packages with the other Delivery Associate. (*Id.* at ¶¶ 19-20.) After the Delivery Associate satisfactorily completes on-the-job training, he or she is assigned a route. (*Id.* at ¶ 21.)

Around January to February 2020, Plaintiff applied for a Delivery Associate position at the DMC2 delivery station with both of Amazon's DSPs, Defendant Venus and Precise. (*Id.* at ¶ 22.) While Defendant Venus was waiting for the results of Plaintiff's background check, Precise offered Plaintiff employment. (*Id.* at ¶ 23.) Rather than wait for Defendant Venus to complete the hiring process, Plaintiff decided to work for Precise. (*Id.* at ¶ 24.) Defendant Venus did not hire Plaintiff in Spring 2020. (*Id.* at ¶ 25.) Plaintiff went through the on-boarding process with Precise in February 2020. (*Id.* at ¶ 26.)

Plaintiff was scheduled by Precise to attend in-person training at DMC2 on March 3-4, 2020. (*Id.* at ¶ 27.) Plaintiff only attended about an hour of the two-day training. (*Id.* at ¶ 28.) During the training, Stevie Swan, an Amazon driver trainer, instructed Plaintiff to put his cellphone away. (*Id.* at ¶ 29.) Later, Ms. Swan informed the class that they could use their cellphones to take pictures of certain slides. (*Id.* at ¶ 30.) Plaintiff questioned why he had been instructed to put away his cellphone but the class could otherwise use their cell phones. (*Id.* at ¶ 31.) The situation escalated, and Ms. Swan asked Plaintiff to leave the classroom. (*Id.* at ¶ 32.)

There is a dispute between the parties as to whether Plaintiff had shoved or physically assaulted Ms. Swan when leaving the training room or whether Ms. Swan opened the door herself while Plaintiff left without touching her. In addition, as set forth more fully below, Plaintiff presented evidence at summary judgment that Ms. Swan acts in a discriminatory manner towards non-Caucasians, from the deposition testimony of Lena Brooks, who at the relevant time was Operations Manager for Defendant Venus. Ms. Brooks testified that she observed that Ms. Swan treated African American trainees more harshly than Caucasian trainees and was biased against non-Caucasians.

In September 2020, Plaintiff applied for employment with Defendant Venus. (*Id.* at ¶ 33.) On occasion, Defendant Amazon informs Defendant Venus that it may not hire certain applicants because of their behavior. (*Id.* at ¶ 34.) Ms. Swan requested that Plaintiff (1) not be allowed back at DMC2, the Amazon station where he attended training, and (2) not be allowed to work for Defendant Amazon or any of the DSPs who performed services out of DMC2. (*Id.* at ¶ 35.) Ms.

Swan did not make that request at the urging of Defendant Venus, Precise, or any other DSP. (*Id.* at ¶ 36.) Ms. Swan testified that when Plaintiff applied to work for Defendant Venus after the March 3, 2020 training, she spoke with Travis Tenschert, Amazon's acting Operations Manager, and informed him that she was not comfortable training Plaintiff. (*Id.* at ¶ 37.) According to Mr. Bandev Nawaz and Mr. Karl Chaney, Defendant Amazon informed Defendant Venus that Defendant Venus could not hire Plaintiff at DMC2 because of the March 3, 2020 training incident.[2] (*Id.* at ¶ 38.) Mr. Nawaz and Mr. Chaney testified that Defendant Venus followed Defendant Amazon's directive regarding Plaintiff and did not hire him. (*Id.* at ¶ 39.) Defendant Venus informed Plaintiff that he could not work for Venus. (*Id.* at ¶ 40.)

Plaintiff filed his third amended complaint on March 16, 2022, which consists of four multi-part counts:

- Count 1, violation of the Missouri Human Rights Act ("MHRA"), alleging race discrimination, harassment, and aiding and abetting;
- Count 2, violation of the MHRA, § 213.070, alleging retaliation and aiding and abetting;
- Count 3, violation of 42 U.S.C. §§ 1981 (discrimination, retaliation) and 1985 (civil conspiracy); and
- Count 4 (against only the Defendant Amazon and not Defendant Venus), violation of the MHRA and Title VII, alleging race discrimination, harassment, and retaliation in.

Further facts are set forth as necessary.

**Legal Standard**

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a). The Court views the evidence "in the light most favorable to the nonmoving party and giv[es] the nonmoving party the benefit of all reasonable inferences." *Fed. Ins. Co. v. Great Am. Ins. Co.*, 893 F.3d 1098, 1102 (8th Cir. 2018) (citations and quotation marks omitted). "If the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party,

---

[2] Defendant Amazon's statement of uncontroverted material facts indicates that Amazon trainer Ms. Alicia Callahan told then-Venus Operations Manager Chaney that Plaintiff could not be on-boarded due to issues in the training with Ms. Swan. (Doc. 143 at ¶¶ 88-89.)

4

summary judgment should be granted." *Smith-Bunge v. Wis. Cent., Ltd.*, 946 F.3d 420, 424 (8th Cir. 2019) (citation omitted). At the summary judgment stage, the movant must "support" its motion either by "citing to particular parts of materials in the record" or by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); Rule 56(c)(1).

In resisting summary judgment, the nonmoving party may not rest on the allegations in its pleadings, but must, by affidavit and other evidence, set forth specific facts showing that a genuine issue of material fact exists. Rule 56(c); *see also Thomas v. Corwin,* 483 F.3d 516, 527 (8th Cir. 2007) (mere allegations, unsupported by specific facts or evidence beyond a nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment). An "adverse party may not rely merely on allegations or denials, but must set out specific facts – by affidavits or other evidence – showing [a] genuine issue for trial." *Tweeton v. Frandrup*, 287 F. App'x 541, 541 (8th Cir. 2008) (citing Rule 56(e)). In so doing, the nonmoving party "cannot create sham issues of fact in an effort to defeat summary judgment." *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 402 (8th Cir. 1995) (citation omitted). To controvert a factual position, the nonmoving party must "refer specifically to those portions of the record upon which [he] relies." *Jones v. United Parcel Serv., Inc.*, 461 F.3d 982, 990 (8th Cir. 2006) (citation omitted).

## Discussion

In discrimination cases, a plaintiff can establish a claim by presenting either direct evidence or circumstantial evidence. *Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 873 (8th Cir. 2010); *Carraher v. Target Corp.*, 503 F.3d 714, 716 (8th Cir. 2007). Here, Plaintiff presents no direct evidence of discrimination and relies on circumstantial evidence. In such cases, the Court applies the *McDonnell-Douglas* burden-shifting framework. *Id. Lake* summarizes the framework well:

> Under *McDonnell Douglas*, the plaintiff initially has the burden to establish a prima facie case of discrimination. A prima facie case creates a rebuttable presumption of discrimination. The burden then shifts to the defendant to provide a legitimate, nondiscriminatory reason for its decision. If the defendant provides such a reason, the presumption disappears, and the burden shifts back to the plaintiff to show that the proffered reason was pretext for discrimination.

*Lake*, 596 F.3d at 873-74 (internal citations and quotations omitted).

Defendant Venus contends it is entitled to summary judgment on each of Plaintiff's claims against it. (Doc. 127.)

I.   **Racial Discrimination Claims:  MHRA (Count 1); § 1981 (Count 3)**

Section 213.055, RSMo., prohibits discrimination in hiring by an employer based on race, as well as other racial discrimination by an employer respecting the terms and conditions of employment.  Defendant Venus argues (1) that Plaintiff cannot state a prima facie case of discrimination, (2) that Defendant Venus had a legitimate, nondiscriminatory reason for not hiring Plaintiff, and (3) that Plaintiff cannot demonstrate pretext.  (Doc. 138 at 9-10.)

A.   **Prima Facie Case**

For his § 1981 and MHRA claims, under *McDonnell Douglas*, Plaintiff must first establish a prima facie case of discrimination, that is:  (1) he is a member of a protected group; (2) he was qualified for the relevant position; (3) he suffered an adverse employment action; and (4) he suffered that adverse action under circumstances giving rise to an inference of discrimination. *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 993 (8th Cir. 2011); *see Roxas v. Presentation College,* 90 F.3d 310, 315 (8th Cir.1996) (Title VII discrimination analysis applies to discrimination claims under Section 1981); *Hossaini v. W. Mo. Med. Ctr.,* 97 F.3d 1085, 1088 (8th Cir.1996) (Title VII discrimination analysis applies to discrimination claims under the MHRA).

Plaintiff asserts Defendant Venus is liable for having aided and abetted in the non-hiring of Plaintiff in March 2020 and September 2020, for the shared responsibilities of hiring and selecting delivery drivers, and for having participated in excluding Plaintiff from employment as a delivery driver.  (Doc. 149 at 53.)  Plaintiff further argues summary judgment as to his MHRA claims should be denied for the reasons argued in relation to his claims under § 1981.  (*Id.* at 56.)  In that section, Plaintiff argues he meets all the elements of his claim:  he belongs to a protected class in that he is an African American; an adverse action was taken against him in that he was not hired in March 2020 and in September 2020, to open positions for which he was qualified; and there is evidence that his race was a motivating factor in not hiring him for the respective positions in that multiple witnesses observed and shared their opinion that Ms. Swan was racially biased against Plaintiff because he was black.  (*Id.* at 44-47.)

"The required prima facie showing is a flexible evidentiary standard, and a plaintiff can satisfy the fourth part of the prima facie case . . . by showing more-favorable treatment of similarly-situated employees who are not in the protected class, or biased comments by a decisionmaker." *Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1019 (8th Cir. 2011) (internal quotation marks omitted).  In addition, "if a non-decisionmaker performs an act motivated by a discriminatory bias that is

6

intended to cause, and that does proximately cause, an adverse employment action, then the employer has cat's-paw liability[.]" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1045 (8th Cir. 2011) (citing *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011)). "This theory requires that there be a person possessing both (1) the necessary animus and (2) influence, leverage or control over the decisionmaker, such that it could be said the decisionmaker was acting at the person's bidding." *Edwards v. Lynch*, 111 F. Supp. 3d 989, 1003 (W.D. Mo. 2015) (citing *Qamhiyah v. Iowa State Univ. of Science & Tech.*, 566 F.3d 733, 742-45 (8th Cir. 2009).

Here, the evidence supporting the fourth element of Plaintiff's prima facie case includes the following testimony from Ms. Brooks:

> Q. Did you ever hear complaints about the way Stevie Swan treated --
>
> A. Stevie -- a lot of people complained about how they were treated by Stevie.
>
> Q. And when you say "a lot of people," we're talking about the trainees that you came into contact with?
>
> A. Some trainees I came into contact with. And even DSP owners, DSP managers as well. Once Nicole Napper was no longer over training, it was -- it was a discipline for all of us.
>
> Q. And why is that?
>
> A. Stevie was just different, like I said. I mean, I -- I understand you follow all the rules, but I mean, if you were just 30 seconds late, you couldn't be in class. If it was just -- it was always something. It always just seemed like she was finding something -- it just seemed like she was always finding something.
>
> Q. Did you ever observe that she was judgmental?
>
> A. I -- I personally felt like she was.
>
> Q. And how so?
>
> A. I don't really know how to explain it. I just -- her correspondence, her attitude, how she treated other people. If you were a clean-cut white person you wouldn't be treated the same way if you were a person of color who sagged their pants, let me say that. You can get kicked out class if your pants were even too low. But, I mean, I didn't let my drivers sag their pants. I would ask them to pull them up, but I wouldn't kick them out of class or send them home for the day. Let me say that.
>
> Q. I mean, did you have to have conversations with your drivers about, you know, you might want to pull up your pants because, you know, you need to do that?
>
> A. Absolutely. Oh, all the time.
>
> Q. But even having had those conversations, were there times that you found that you had drivers that were kicked out of the class because of their appearance?

7

A. Yes.

Q. Can you give me any examples that you remember?

A. Well, let me -- if a guy was sagging his pants and went to her class, she would probably make -- she would have made him leave. If it would have been a driver that came to work that day, I would have asked him to pull his pants up.

Q. What about--

A. So that's what I felt like she was -- she was judgmental.

Q. What about --

A. Based on appearance.

Q. What about tattoos?

A. I don't necessary know if she was judgmental on that aspect.

Q. Did you feel that --

A. And, of course, this is just my opinion too.

Q. Sure. And let's talk about that. Is your opinion based upon your observations of the way that Stevie Swan treated trainees in her classroom when comparing the way she treated a Caucasian or a non-Caucasian?

A. Yes.

Q. And she was harder on the non-Caucasian?

A. I -- yes.

Q. In your experience --

A. Yes.

Q. -- and your observation?

A. But that's my opinion. That's what I observed.

Q. Did you ever express that opinion to Mr. Bandev [sic]?

A. Yes.

Q. I'm sorry. Mr. Nawaz?

A. Yes.

Q. Okay.

A. He -- him and I both had the conversation that we're not the right skin color.

Q. And what was --

A. He knew that.

8

> Q. And what was that conversation?
>
> A. They were -- that conversation came out quite a bit, actually, in our conversations when something would -- or somebody would get kicked out of class or somebody wasn't allowed to attend the class, we would jokingly say, it's -- it's because of our color. It's because we're too brown.
>
> Q. And just for the record -- I didn't ask you that, but what is your race?
>
> A. I am half black and half white.
>
> Q. Okay. And Mr. Nawaz -- do you know that his race is?
>
> A. Indian. I assume they call -- he's from India. I know that.

(Doc. 150-2 at 16-17.) Ms. Brooks also testified that she spoke with Mr. Chaney, who worked in management for Amazon at the time, about Ms. Swan and Plaintiff, and Mr. Chaney agreed that Ms. Swan was racially biased and was being biased against Plaintiff because Plaintiff was African American but felt there was nothing they could do about it:

> Q. Sure. I think you told me that you did speak with Karl Chaney at one point in time about Mr. Rimson not being hired. Do you recall that?
>
> A. I do. He -- I think him and I had a conversation about the whole Stevie situation as well. And he agreed with me with Stevie just being biased towards him. Because we were black. That's -- that was Karl and my conversation. I do remember that.
>
> Q. At the time that you spoke with Mr. Chaney about the conversation that you had, was Mr. Chaney still employed with -- with Amazon?
>
> A. Yes. Because I had not hired him yet. I took him too.
>
> Q. Did Mr. Chaney explain any more about his feelings about Ms. Swan?
>
> A. He had an opinion like I did. But like I said, that's just our opinion. But he had an opinion, like I did. And it's-- it's something you just -- there's really nothing you can do about it.
>
> Q. When you say there's nothing that you can do about it, you're not referring to the opinion. You're referring to race discrimination --
>
> A. Correct.
>
> Q. -- correct? And Ms. Swan's – the observations that you had that she was biased based on skin color?
>
> A. Yes. Like I said Emily Dowding was very aware of that too. Nawaz was very aware of that as well. But like they both have DSPs with Amazon, so they definitely do not want to rock any boats or make anybody angry in the higher-ups.

(Doc. 150-2 at 18.)

9

Viewing the record in the light most favorable to Plaintiff, the testimony of Ms. Brooks is sufficient evidence to raise a question of material fact as to whether race was a motivating factor in Defendant Venus' decision not to hire Plaintiff. In particular, there is a question as to whether Ms. Swan's communication to Amazon requesting that Plaintiff not be allowed back at DMC2 to work on behalf of Amazon or any of the DSPs who performed services out of that station and informing Defendant Amazon that she was not comfortable training Plaintiff constituted performance of an act motivated by a discriminatory bias. There is a question whether that act was intended to cause, and did proximately cause, an adverse employment action, namely, Defendant Amazon's directive to Defendant Venus to not hire Plaintiff.

Accordingly, Defendant Venus' argument that it is entitled to summary judgment because Plaintiff cannot make out his prima facie case of racial discrimination in failure to hire under the MHRA and § 1981 is without merit.

### B. Legitimate, Nondiscriminatory Reason

Next, the Court considers whether Defendant has a legitimate, nondiscriminatory reason for its actions. "This burden is exceedingly light;" Defendant must merely proffer a non-race, non-age based, or non-retaliatory reason." *Ottman v. City of Indep., Mo.*, 341 F.3d 751, 758 (8th Cir. 2003). Defendant Venus argues Plaintiff cannot demonstrate his race was a motivating factor in Defendant Venus' decision not to hire Plaintiff, but rather the decision was based on a legitimate, non-discriminatory reason. (Doc. 138 at 9.) Defendant Venus contends it decided not to hire Plaintiff based on Defendant Amazon's direction that Plaintiff could not return to DMC2. (*Id.*) Defendant Venus asserts there is no evidence that Plaintiff's race factored into or played a role in Defendant Venus' decision to not proceed with his application. (*Id.*)

Here, Defendant Venus offers evidence that it did not hire Plaintiff because Defendant Amazon told Defendant Venus not to hire Plaintiff. Specifically, after in-person training in March of 2020, during which Ms. Swan asked Plaintiff to leave the classroom, Ms. Swan requested that Plaintiff (1) not be allowed back at DMC2, the Amazon station where he attended training, and (2) not be allowed to work on behalf of Defendant Amazon or any of the DSPs who performed services out of that station. (Doc. 50 at ¶¶ 27, 32, 35.) According to Mr. Nawaz and Mr. Chaney, Defendant Amazon informed Defendant Venus that Defendant Venus could not hire Plaintiff at DMC2 because of the March 3, 2020 training incident. (*Id.* at ¶ 38.) Mr. Nawaz and Mr. Chaney testified

that Defendant Venus followed Defendant Amazon's directive regarding Plaintiff and did not proceed with hiring him. (*Id.* at ¶ 39.)

At this stage, the Court finds Defendant Venus has sufficiently proffered a legitimate, nondiscriminatory reason for its actions.

### C. Pretext

Finally, the Court turns to whether Plaintiff has offered sufficient evidence of pretext to survive summary judgment. To rebut the legitimate, nondiscriminatory reasons of Defendant, Plaintiff must "point to enough admissible evidence to raise genuine doubt as to the legitimacy of the defendant's motive, even if that evidence does not directly contradict or disprove the defendant's articulated reasons for its actions." *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 995 (8th Cir. 2011) (cleaned up). "Plaintiff must . . . establish the existence of facts which if proven at trial would permit a jury to conclude that the defendant's proffered reason is pretextual and that intentional discrimination was the true reason for the defendant's actions." *Krenik v. Cnty. of Le Sueur*, 47 F.3d 953, 958 (8th Cir. 1995). To do so, Plaintiff "may show that [Defendant's] explanation is unworthy of credence because it has no basis in fact, or [he] may show pretext by persuading the court that discriminatory animus more likely motivated [Defendant]." *Guimaraes v. SuperValu, Inc.*, 674 F.3d 962, 975 (8th Cir. 2012). Plaintiff's "burden to show pretext merges with the ultimate burden of persuading the court that [he was] the victim of intentional discrimination." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1046 (8th Cir. 2011) (internal quotation marks omitted).

Here, the testimony from Ms. Brooks (an employee of Defendant Venus) that she observed Ms. Swan (an employee of Defendant Amazon) treat African American trainees more harshly than Caucasian trainees and be biased against non-Caucasians is sufficient to meet Plaintiff's burden at this stage. In short, although Defendant Venus has explanations and facts to support a contrary inference, the evidence presented by Plaintiff establishes a genuine issue of fact. Therefore, from these facts taken as a whole, a reasonable trier of fact could find intentional discrimination by Amazon employee, Ms. Swan, led to Defendant Venus's decision to not hire Plaintiff, resulting in cat's paw liability for Defendant Venus.

Accordingly, the Court finds Plaintiff has established a genuine issue of material fact as to pretext sufficient to defeat Defendant's motion for summary judgment as to Plaintiff's racial discrimination claims.

## II. Racial Harassment Claims: MHRA (Count 1)

Defendant Venus next contends Plaintiff's racial harassment claims fail because he was not employed by Defendant Venus at the time of the alleged harassment. (Doc. 138 at 11.) Plaintiff makes no opposing argument in his brief on this matter.

"Hostile work environment harassment occurs when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Stone v. McGraw Hill Fin., Inc.*, 856 F.3d 1168, 1175 (8th Cir. 2017) (internal quotation omitted). "A successful claim of a hostile work environment requires the plaintiff to show: (1) he is a member of a group protected under the MHRA; (2) he was subjected to unwelcome harassment; (3) the plaintiff's membership in the protected group was a motivating factor in the harassment; and (4) a term, condition, or privilege of the plaintiff's employment was affected by the harassment." *Eivins v. Missouri Department of Corrections*, 636 S.W.3d 155, 179 (W.D. Mo. 2021) (cleaned up).

"[S]ome conduct well beyond the bounds of respectful and appropriate behavior is nonetheless insufficient to be severe and pervasive." *Henson v. Union Pac. R.R. Co.*, 3 F.4th 1075, 1083 (8th Cir. 2021) (internal quotation marks omitted). "In determining whether a workplace environment was sufficiently hostile or abusive, we look at the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Gipson v. KAS Snacktime Co.*, 171 F.3d 574, 578 (8th Cir. 1999) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

Here, Plaintiff's claims of racial harassment include allegations and evidence relating to the time he was employed by Defendant Amazon (customers using racial slurs and displaying guns) and during on-boarding with Precise (cellphone usage), which involved members of the general public and employees of Defendant Amazon. Because Plaintiff was never employed by Defendant Venus, the Court thus finds Defendant Venus is entitled to summary judgment as to Plaintiff's claim of racial harassment based on that evidence. Plaintiff also appears to claim harassment based on Venus' failures to hire him. To that extent, Venus is entitled to summary

judgment on Plaintiff's harassment claim because such acts were not frequent, pervasive, or physically threatening.

## III. Retaliation Claims:  MHRA (Count 2), and § 1981 (Count 3)

Defendant Venus asserts Plaintiff cannot show he suffered any adverse action causally connected to any protected activity.  (Doc. 138 at 12.)  Defendant Venus further argues that because Plaintiff cannot establish a prima facie case for retaliation, it is also entitled to summary judgment as to Plaintiff's § 1981 retaliation claim.  (Doc. 138 at 14-15.)  Defendant Venus also claims that even if Plaintiff meets his prima facie burden, his claim still fails under the *McDonnell-Douglas* burden-shifting framework requiring him to prove pretext.  (*Id.* at 15.)

### A.  MHRA (Count 2) analysis

An employer cannot "retaliate or discriminate in any manner against any other person because such person has opposed any practice prohibited by th[e MHRA.]"  § 213.070.1(2), RSMo.  "A retaliation claim under the MHRA requires [Plaintiff] to show that (1) he complained of an MHRA-prohibited activity, (2) [Defendant] took an adverse employment action, and (3) a causal connection exists between the complaint and adverse action."  *Heuton v. Ford Motor Co.*, 930 F.3d 1015, 1023 (8th Cir. 2019) (internal quotation marks omitted).  The MHRA has defined "because" to mean, "as it relates to the adverse decision or action, the protected criterion was the motivating factor."  § 213.010(2), RSMo.  "Motivating factor" is defined to mean "the employee's protected classification actually played a role in the adverse action or decision and had a determinative influence on the adverse decision or action."  § 213.010(19), RSMo.

### B.  § 1981 (Count 3) analysis

To establish a prima facie case of retaliation pursuant to § 1981, Plaintiff must show: (1) he engaged in protected activity; (2) he suffered a material adverse employment action; and, (3) there was a causal connection between the protected activity and the adverse action.  *Young v. Builders Steel Co.*, 754 F.3d 573, 579 (8th Cir. 2014).

The Court applies the same analysis "to § 1981 retaliation claims and to retaliation claims under Title VII of the Civil Rights Act of 1964."  *Sayger v. Riceland Foods, Inc.*, 735 F.3d 1025, 1030 (8th Cir. 2013).  "Although the wording of § 1981 differs from that of Title VII, the underlying retaliation analysis is the same and [the Court] may look to Title VII precedent to inform [its] analysis of the elements under § 1981."  *Id.*  "Protected activity under Title VII includes, (1) opposition to employment practices prohibited under Title VII, and (2) filing a charge,

testifying, assisting or participating in any manner in an investigation, proceeding, or hearing under Title VII." *Comstock v. Consumers Mkts., Inc.*, 953 F. Supp. 1096, 1103 (W.D. Mo. 1996). "A materially adverse action must be more disruptive than a mere inconvenience or an alteration of job responsibilities. There must be a material change in employment status - a reduction in title, salary, or benefits." *Box v. Principi*, 442 F.3d 692, 696 (8th Cir. 2006) (cleaned up).

### C. Discussion

Defendant Venus does not contest that Plaintiff engaged in protected activity "based on events that allegedly occurred at Amazon" and that Defendant Venus did not hire Plaintiff. Rather, Defendant Venus argues Plaintiff cannot establish a causal connection between his complaints of alleged discrimination and Defendant Venus' decision not to hire him and cannot show pretext. (Doc. 138 at 13, 15.) Defendant Venus argues it made a legitimate, non-retaliatory decision not to hire Plaintiff based on Defendant Amazon informing Defendant Venus that Plaintiff was not allowed at DMC2, and his prior complaints were not discussed in conversations between Defendant Amazon and Defendant Venus about whether he could work for Defendant Venus.

Plaintiff argues a jury could reasonably conclude retaliation was a motivating factor in Defendant Venus not hiring Plaintiff because of (1) testimony from Ms. Brooks that she knew that Plaintiff had raised an issue to Ms. Swan (Defendant Amazon employee) in her class on March 3, 2020, about her treatment of him in the use of phones in comparison to others, and (2) Ms. Brooks's observation that Ms. Swan treated Caucasians more favorably than non-Caucasians and was tougher on minorities in her classroom. Plaintiff argues retaliatory motive is also supported by Ms. Brooks' testimony that Plaintiff believed he had been removed from the classroom because he was African American. Plaintiff also contends that upon request by Ms. Brooks, Ms. Hayes showed Ms. Brooks video clips that Ms. Hayes had made, which have not been produced and have disappeared. Plaintiff claims these video clips contradict the accusations made by Ms. Swan against Plaintiff, wherein she claimed Plaintiff had shoved or physically assaulted her, when in fact, the video showed Ms. Swan opening the door herself while Plaintiff left. The Court finds these assertions sufficient to create a question of material fact as to whether retaliation was a motivating factor in Plaintiff not being allowed back at DMC2 or to work for Amazon or for any other DSP working out of DMC2.

Viewing the evidence in the light most favorable to Plaintiff, there is a question of material fact as to whether Defendant Venus' decision not to hire Plaintiff was motivated by retaliatory

14

animus. In particular, there is a question as to whether Ms. Swan's communication to Defendant Amazon requesting that Plaintiff not be allowed back at DMC2 to work on behalf of Defendant Amazon or any of the DSPs who performed services out of that station and informing Defendant Amazon that she was not comfortable training Plaintiff constituted performance of an act motivated by a retaliatory bias stemming from Plaintiff's questioning his differential treatment in the training and/or Ms. Swan's knowledge of Plaintiff's prior protected activities of making a formal report or complaint. There is a question whether that act was intended to cause, and did proximately cause, an adverse employment action, namely, Defendant Amazon's directive to Defendant Venus not to hire Plaintiff.

Accordingly, Defendant Venus' argument that it is entitled to summary judgment as to Plaintiff's claims of retaliation under the MHRA and § 1981 fails.

### IV. Aiding and Abetting Claims: Racial Discrimination and Harassment (Count I), Retaliation (Count 2)

Defendant Venus contends that because Plaintiff's race discrimination and retaliation claims under the MHRA warrant dismissal, Plaintiff's aiding and abetting claims must also be dismissed because a viable underlying MHRA claim is a prerequisite to asserting any "aiding and abetting" claim. (Doc. 138 at 14.)

Section 213.070.1(1), RSMo., prohibits aiding and abetting in racial discrimination by an employer. "Missouri law defines 'aiding and abetting' as 'affirmatively act[ing] to aid the primary tortfeasor' by giving 'substantial assistance or encouragement' to him." *Henson v. Union Pac. R.R. Co.*, 3 F.4th 1075, 1079 (8th Cir. 2021) (quoting *Bradley v. Ray*, 904 S.W.2d 302, 315 (Mo. Ct. App. 1995)). "In analyzing employment discrimination cases under the MHRA, we are guided both by Missouri law and applicable federal employment discrimination cases." *M.W. ex rel. K.W. v. Six Flags St. Louis, LLC*, 605 S.W.3d 400, 409 (Mo. Ct. App. 2020).

To the extent a question of fact exists as to Plaintiff's race discrimination claim against Defendant Venus, its argument as to Plaintiff's aiding and abetting race discrimination claim fails. Defendant Venus is not entitled to summary judgment as to Plaintiff's claim that Defendant aided and abetted racial discrimination. Likewise, because there is a question of material fact as to

15

Case 4:21-cv-00553-RK   Document 195   Filed 01/25/23   Page 15 of 17

Plaintiff's retaliation claim, Defendant Venus is not entitled to summary judgment as to Plaintiff's claim that Defendant Venus aided and abetted retaliation.[3]

## V. Civil Conspiracy Claim: § 1985 (Count 3)

Defendant Venus asserts Plaintiff's Title VII claims can form no basis for a claim under 42 U.S.C. § 1985, and thus his civil conspiracy claim fails for this reason alone. (Doc. 138 at 16.) Defendant Venus further contends that even if Plaintiff could seek relief under § 1985, his claim would still fail because Plaintiff fails to point to at least some facts which would suggest that Defendants Venus and Amazon reached an understanding to violate his rights. (Doc. 138 at 16.)

Plaintiff does not address Defendant's arguments regarding § 1985 or make any argument that Plaintiff can show Defendants Venus and Amazon reached an understanding to violate his

---

[3] The Missouri Supreme Court recently decided the case of *State ex rel. Swoboda v. Missouri Commission on Human Rights*, 651 S.W.3d 800 (2022). In that case, the plaintiff brought a charge of discrimination against his employer, the Kansas City Police Department ("KCPD"), and a law firm retained to represent his employer in a separate case. *Id.* at 802-03. The plaintiff claimed that KCPD retaliated against him for supporting another officer who brought a charge of discrimination against KCPD. *Id.* The plaintiff also alleged that the law firm aided and abetted KCPD's retaliation by telling him to think about his career before he testified at the deposition. *Id.* Subsequently, the MCHR dismissed the plaintiff's claim against the law firm on the ground that it lacked jurisdiction because the plaintiff did not allege he had an employer-employee relationship with the law firm. *Id.* The plaintiff then sought mandamus relief in the circuit court, which was granted, the circuit court ordering the MCHR to directing the Commission to rescind its dismissal, accept the charge, and conduct an investigation. *Id.* at 803. The Missouri Supreme Court reversed and remanded the circuit court's judgment in the plaintiff's favor. The Missouri Supreme Court reasoned:

> Mandamus proceedings may be used to enforce a clear, specific, unequivocal right that is presently existing. They cannot be utilized to adjudicate whether an individual is afforded a right but, rather, can compel performance of a right only that has already been established. Here, the ability to pursue a claim under section 213.070.1, absent an employer-employee relationship, does not plainly follow from relevant statutory provisions. [The plaintiff] does not cite any prior Missouri decisional law that has interpreted section 213.070 to not require an employment relationship, nor does he produce any other authority demonstrating he can pursue his claim. Rather than seeking to enforce a previously delineated right, [the Plaintiff] attempted to adjudicate whether, under applicable statutes, his claim was permissible. The issuance of mandamus relief was foreclosed in this case in which an issue of first impression is presented.

*Id.* at 813. The Missouri Supreme Court thus held the circuit court's decision to grant mandamus relief was in error.

Although *Swoboda* analyzes the permissibility of an employment discrimination claim in the absence of an employer-employee relationship, it is distinguishable from Plaintiff's claims in this case. A claim for failure to hire plainly follows from the relevant statutory provisions, which contemplate the absence of such relationship, as it is inherent in the nature of the claim.

16

constitutional rights. The Court finds Plaintiff fails to support his § 1985 claim and Defendant Venus is entitled to summary judgment as to that claim as it is contained in Count 3.

## Conclusion

Accordingly, Defendant Venus' motion for summary judgment (Doc. 108) is (1) **GRANTED** as to Plaintiff's MHRA racial harassment and aiding and abetting racial harassment claims as contained in Count 1, and Plaintiff's § 1985 civil conspiracy claim as contained in Count 3; and (2) **DENIED** as to Plaintiff's MHRA race discrimination and aiding and abetting race discrimination claims as contained in Count 1, Plaintiff's MHRA retaliation and aiding and abetting retaliation claims as contained in Count 2, and Plaintiff's § 1981 race discrimination and retaliation claims as contained in Count 3.

**IT IS SO ORDERED.**

          s/ Roseann A. Ketchmark
          ROSEANN A. KETCHMARK, JUDGE
          UNITED STATES DISTRICT COURT

DATED: January 25, 2023